CONDENSER CORPORATION OF AMERI-
CA v. MICAMOLD RADIO
CORPORATION.

No. 27.

Circuit Court of Appeals, Second Circuit.

Nov. 30, 1944.

Kenneth S. Neal and Ward, Crosby & Neal, all of New York City, for appellant.

W. D. Keith and F. A. Bower, both of New York City, for appellee.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The defendant appeals from a judgment against it, holding valid and infringed claims 1, 2, 3, 9, 10, 11 and 12 of patent No. 1,940,847, issued on December 26, 1933 to Harold I. Danziger. The claims may, for convenience, be divided into two groups: One, Two and Three, of which Claim One alone need be considered; and Claims Nine, Ten, Eleven and Twelve, of which Claim Eleven will serve for all. Each is quoted in the margin.* The patented machine was designed to produce electric condensers automatically. A condenser is made up of two electrically conducting surfaces in a circuit, electrically separated from each other, so that the circuit is completed only through the intervening space. In order to reduce this space the two surfaces are ordinarily separated by some dielectric substance, such as a sheet of paper. Obviously, it is essential that by no chance shall there be any metallic connection between the two surfaces, else the current would pass from one to the other, and there would be no condenser. Long before Danziger filed his application in 1925 it had been the practice of the art to make condensers upon a spool, called at times an "arbor" or a "mandrel." Two strips of tin-foil, rolled upon separate spools, were each set be-

---

* "1. In a condenser winding machine, a supply of paper, a supply of metallic foil, a rotatable arbor on which the paper and foil are adapted to be wound, means for severing the foil and paper, means driven in timed relationship with the arbor, and means controlled by the last-mentioned means for causing the operation of said severing means to sever the foil prior to the severance of the paper."

"11. In apparatus for winding a continuous strip upon a mandrel, means for exerting a continuous pull upon the strip in the direction of the mandrel, means for cutting said strip during the winding thereof after a predetermined length thereof has been wound, and means operable in timed relation to the cutting means for momentarily increasing the tension of the strip, said last named means comprising a pair of relatively movable and normally spaced friction rollers positioned behind the cutting point and on opposite sides of the strip, whereby movement of the rollers to engage the strip there between will counteract the pulling means and thereby create said tension."

tween two spools of paper. All six strips were brought together by a pair of rollers, and the ends were fastened to the "arbor," which pulled them off their supply spools under tension. After enough had been unrolled for the proposed condenser, the combined strips were cut by a knife, and the roll so formed was taken off the spool and flattened. This was the condenser; one terminal of the circuit was connected with one strip of foil; the other, with the other. There is, however, a danger in this practice that the ends of the two strips of foil may touch; and it therefore became the custom to insure against this by turning back the end of each strip of foil upon itself, tucking it in so that the dielectric strips should overlap it by an adequate margin. It was to avoid this operation that Danziger's Claims One, Two and Three were aimed; his machine first automatically cuts the foil strips, but continues to draw off the paper strips with no foil between them until they are themselves cut at a later point. Thus arise the desired overlaps of dielectric. Claim One is a highly generalized statement of this process.

In 1905 the British branch of the well-known German electrical engineers, Siemens, obtained a patent (1905 Brit. Pat. No. 13,682) for a machine to do precisely what Danziger's machine accomplishes. The only difference was that in the Siemens machine the mechanism for cutting the foil strips was not automatically timed with the winding "arbor" or "mandrel," as Danziger timed it. Instead, an operator had to stop the rolls which fed the foil strips and cut the strips themselves, by manipulating a lever at the proper moment. For this reason the Siemens machine was not an anticipation of Danziger; it was not completely automatic; it lacked that element of Claim One which was defined as "means driven in timed relationship with the arbor" which means in turn controlled the cutting means. Our decision comes therefore to the query whether it demanded invention to conceive of making a machine automatic in the one respect which Siemens had omitted. The plaintiff stands squarely upon the position that, considering the lapse of twenty years between the appearance of Siemens's patent and Danziger's application, and the success of Danziger's machine when it appeared, it was an invention to complete the automaticity of Siemens's machine by timing the cutters with the "arbor."

It is true that we have again and again said that in deciding the issue of invention we would look to the history of the art, and we understand that the Supreme Court still countenances that approach (Goodyear Tire & Rubber Co. v. Ray-O-Vac, 321 U.S. 275, 278, 279, 64 S.Ct. 593); but it can lead one astray unless it is carefully hedged about. The lapse of time between one invention and another of itself tells very little. The patent law assumes that whatever is disclosed in public records, here or in other countries, must be taken as part of the inheritance of the art, regardless of the art's actual acquaintance with it: i.e., regardless of whether it ever went into use, or in fact enriched the common store; indeed, were it not so, patent monopolies would scarcely be tolerated at all. But, since that is the law, lapse of time alone is no test of the difficulty of taking a last step, until it appears that the art in fact knew the earlier steps, already taken. The delay may have been due to the difficulty of taking these, and whatever the benefit which the inventor who takes a last step has in fact conferred, he will be credited only with the ingenuity necessary to pass beyond the earlier, though unknown, ones. In the case at bar, it does not appear that the Siemens disclosure was ever exploited, or became known to the art in any other way; and it would be a gratuitous assumption that manufacturers, having learned from Siemens how to make condensers automatically, and how to secure an overlap of the paper strips at the ends by manually cutting the foil earlier than the paper, had been obliged to wait twenty years for the notion alone that it would be desirable to gear the cutter in phase with the "arbor." Had it been the mechanical difficulties which baffled them, the delay might have been evidence of some invention; but that invention would have lain in contriving the solution, not in the discovery that a solution was desirable; which is all that the defendant can on any theory be thought to have borrowed from Danziger. Moreover, the success of the patented machine has not been such as to indicate that it was a boon to the art. It is true that about a hundred machines in all have been sold; but that was during the years *1929*, *1930* and *1931*, since when "none to speak of" have been sold. The falling off cannot be attributed to the defendant's thirteen machines, for these do not go back of 1934. Thus the selling rec-

ord is by no means impressive. We hold Claims One, Two and Three invalid.

Coming next to the second group of claims, they are directed to securing a momentary tension upon the strips of foil at the instant when they are cut, a detail which Danziger thought useful to prevent "a tendency to belly away from the knife—be pushed away from the knife." This tension can arise in the defendant's machine only after the mandrel has wound the condenser to a diameter greater than the diameter of the "feed rolls" which feed one of the foils with its embracing paper strips. Although at the earlier stage of its winding no condenser is large enough to do so, and although none but the larger condensers ever do become large enough, it is true that there may be, and probably is, some such tension at the later stage of the winding of the larger condensers, and the judge so found. On the other hand the parties have stipulated that "the machine is adjusted as accurately as possible so that the cutter 1 cuts at the time rolls 4 pinch together." It is obvious therefore that the defendant does not seek any tension, for it would be just as useful at the earlier stage of any winding, as later: if it was thought useful at all, it would certainly not have been reserved for the later stage. The judge found that the defendant could modify its machine so that the feed rolls should close after the cut; but the point was not discussed in the testimony, and the finding rests only upon speculation. Moreover, even if the finding is right, no inference can be drawn from it that the construction was deliberately so designed. The plaintiff relies upon the doctrine that a machine will infringe which follows the patent only lamely and spasmodically, and that the intent of an infringer is not material. All that is quite true, but in the case of patents as elsewhere there comes a point where what may be literally a wrong, is of too trifling importance to justify the intervention of a court. This is such a case; we will not enjoin the defendant's machine for a detail, obviously so useless in function. American Safety Device Co. v. Kurland Chemical Co., 2 Cir., 68 F.2d 734; City of Milwaukee v. Activated Sludge Inc., 7 Cir., 69 F.2d 577, 593; Nerney v. New York, New Haven & Hartford Railroad, 2 Cir., 83 F.2d 409. Moreover, it would be equally unwarranted to give judgment for damages or profits; for it is inconceivable that the infringement, if there is any at all,—which

is doubtful at best—could add a cent to the defendant's profits, or could interfere in the slightest degree with the plaintiff's sales. Aerovox Corp. v. Micamold Radio Corp., 2 Cir., 92 F.2d 45, 46; Pratt v. United States, 43 F.Supp. 461, 475, 95 Ct.Cl. 608. We hold the second group of claims not infringed.

Judgment reversed; complaint dismissed.