## RICE et al. v. NASH-KELVINATOR CORPORATION.

### No. 9923.

Circuit Court of Appeals, Sixth Circuit.

July 2, 1945.

Stuart C. Barnes, of Detroit, Mich. (Barnes, Kisselle, Laughlin & Raisch, and Arthur Raisch, all of Detroit, Mich., on the brief), for appellants.

Charles H. Walker, of New York City, (Cook, Smith, Jacobs & Beake, of Detroit, Mich., and Fish, Richardson & Neave, all of New York City, on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

ALLEN, Circuit Judge.

This is an appeal from a judgment dismissing the complaint in a patent infringement suit and holding the claims of Carpenter patent 1,919,500 for an "apparatus for controlling the flow of refrigerant in a refrigerating apparatus" to be functional in character and void for direct anticipation by prior patents and for lack of patentable invention. The three claims of the patent are printed in the margin.[1]

The stated object of the claimed invention is to provide means positioned between the condensing or liquefying apparatus and the cooling unit for restricting and accurately controlling the feeding of the refrigerant at a predetermined rate, said capillary tube connecting with the cooling unit and condenser.

[1] 1. In a mechanical refrigerating system of the mechanical compression expansion flooded type the combination of a pulsating piston type compressor, a condenser, a cooling unit, and a single helical coil capillary tube positioned between the condenser and cooling unit and proportioned as to length and diameter relative to the capacity of said compressor, condenser and cooling unit as to restrict the flow of refrigerant and maintain the transmission to the cooling unit

2. In a refrigerating machine of the mechanical compression, flooded type, the combination of a compressor, a condenser and an evaporator, pipe connections between the evaporator, compressor and condenser, in the order named and a single capillary tube between the condenser and the evaporator of such length and diameter as will maintain a prede-

to such unit so that the feeding will be of a predetermined rate corresponding to the capacity of the refrigerating apparatus.

In a mechanical refrigerator the cooling is effected by causing evaporation of a refrigerant in the evaporator or cooling unit. Evaporation is caused by reduction of the pressure in the evaporator through suction set up by a compressor or pump. When the pressure is reduced the liquid boils at a degree lower than its original boiling rate, and in the process heat is absorbed from material in or around the evaporator, such as food or water in the cooling compartment. The vapor is drawn away from the evaporator by suction of the compressor, compressed and passed on into the condenser. Here the vapor is liquefied and passes into the liquid line for redelivery to the cooling unit, revaporization, and repetition of the cycle. Since the process requires that a high pressure be maintained in the condenser and a low pressure in the evaporator, and at the same time calls for a flow of the necessary amount of refrigerant, some form of control device must be used to check the passage of the liquid refrigerant from the condenser to the evaporator; and this is the problem claimed to be solved by the patent in suit. It had previously been customary to use either expansion valves or float valves, which operated automatically for the constant maintenance of the flow or level of the refrigerant to and in the cooling unit. In place of these valves Carpenter claims for the first time in the art to have substituted a coiled capillary tube. The recommended diameter is .037 of an inch and the length varies from 3 to 17 feet. Coiling of the tube is not material, the primary object of the coiling being merely to save space.[2] The tube interposes through fric-

tion a resistance to the flow of the refrigerant and maintains a pressure differential of about 90 pounds between the condenser, called "the high side," and the evaporator, called "the low side." While the record shows that both the automatic expansion valve and the float valve give a more precisely controlled operation than the capillary, they are relatively complicated in structure and apt to require servicing. A needle valve, used for the same general purpose, requires hand manipulation, which is possible in a large plant but not convenient in an ordinary household.

The application for patent had a difficult career in the Patent Office. Interferences were declared between Carpenter's application and one filed by Lewis W. Eggleston, and also between Eggleston, Carpenter and Alfred Thomson. The law examiner granted motions filed by Eggleston to dissolve the interferences on the ground that the counts were not patentable. On appeal the Board of Appeals affirmed these decisions, and on rehearing adhered to its affirmance. The examiner placed the claims under final rejection. Carpenter again appealed from this order, and the Board again held the device unpatentable over Jaeger, 1,470,574, and Keyes, 1,622,520. A reconsideration of the decision of the Board of Appeals was asked, and as to the claims in issue the Board adhered to its former conclusion, but authorized the allowance of two claims limited to apply to the mechanical compression and flooded type of refrigerating system. Carpenter accepted the suggested amendments and then added a claim, alleged to be drawn along the lines recommended by the Board, and these claims were allowed.

Licenses were taken under the Carpenter

termined ratio between the pressures in the condenser and evaporator during the operation of the compressor whereby a mass of liquid is maintained within substantially predetermined limits at all times in said evaporator during normal operation.

3. In a refrigerating machine of the mechanical compressor flooded type, the combination of a compressor, a condenser and an evaporator, pipe connections between the evaporator, condenser and compressor in the order named, and a single capillary tube, said tube being located between the condenser and the evaporator and of such length and diameter as will maintain a predetermined ratio between the pressures in the con-

denser and evaporator during the operation of the compressor and minimize any tendency of the tube to clog, the said parts of the refrigerating machine and the refrigerant charge being so co-ordinated that the single capillary tube is adapted to function as the regulating device of the flow between the condenser and the evaporator and by reason of the said co-ordination the liquid level in the evaporator is maintained between narrow limits.

[2] The term "capillary" is conceded by both parties to be a misnomer. While capillary action exists in this tube, it has no particular effect upon the refrigerating process. A capillary tube, in common parlance, is a tube of small bore.

patent by a number of important manufacturers of mechanical refrigerators, and some $190,000 was paid in royalties on these licenses prior to this litigation. We do not consider this circumstance conclusive as to patentability under this record. The marked advance in use of the capillary tube coincided with a similar advance in the use of Freon, a refrigerant which went into the commercial market in 1935. Freon 12, the form of refrigerant involved here, is a chemical containing one carbon atom, two chlorine atoms, and two fluorine atoms. It is stable, and presents neither fire nor health hazard. It boils at 22 below zero Fahrenheit, and has properties which are advantageous to the use of the capillary tube. With Freon the heat transfer from vapor to liquid is practically double, which results in greater efficiency. Its low latent heat of evaporation makes it necessary to circulate a relatively large amount of liquid in the tube, making possible the use of a larger bore capillary than with other refrigerants. More than fifty per cent of domestic refrigeration units used Freon in 1941. The coincidence in the increase of the use of the capillary and the use of Freon lends weight to the appellee's contention that the widespread use of the capillary is due not to the existence of patentable invention, but rather to the general advance in the art, together with the increased efficiency and improved heat exchange made possible by the use of this new refrigerant, which enabled manufacturers successfully to use this tube of small diameter and to compete with machines employing the more elaborate float or expansion valves. Commercial success alone will not of itself vitalize an otherwise invalid patent. United States Gypsum Co. v. Consolidated Expanded Metal Cos., 6 Cir., 130 F.2d 888, 893, certiorari denied, 317 U.S. 698, 63 S.Ct. 441, 87 L. Ed. 558. For similar reasons we do not consider it important that the appellee and the predecessor of appellants carried on negotiations as to the pooling of patents, including Carpenter. If the claimed device is not patentable, offers of commercial cooperation have no bearing.

The Chrysler Report, relied on by the appellants, does not illumine this controversy. It listed the Rice water cooler, employing the capillary, as first among several tested by Chrysler for its own use. The report was principally concerned with such matters as quietness of operation and the character of the refrigerant employed.

Kelvinator, which received a low rating in the report, at that time employed sulphur-dioxide, which is difficult and dangerous to handle. The report did not even mention the capillary tube.

However, it is certainly established that the capillary has the advantages of simplicity and low cost, and that it results in the absence of moving parts and enhanced ease in starting. It eliminates service features by doing away with the necessity for extra mechanisms. At the time manufacture was suspended in 1941, some seventy per cent of the household units employed the capillary.

In addition, the capillary feed is substantially constant under different weather conditions. As the pressure varies with the temperature, both pressure and temperature are greater in hot than in cold weather, and the pressure drop between condenser and evaporator is greater in summer than in winter. In the early development of the refrigerator art it was questioned whether the liquid would be kept at a constant level in the evaporator under variations in pressure and evaporating conditions. But it is uncontroverted that this result has been achieved in devices employing the capillary. The refrigerant tends to flash off as gas in the tube under increased heat, and this creates an additional resistance in the capillary due to the bubbles of gas in the stream, which tends to offset the increased flow due to the rise in temperature and pressure. The result is enhanced by the use of Freon as a refrigerant; but it does exist whether or not Freon is employed.

While the capillary tube constitutes an advance in the art, we think that the District Court was clearly correct in holding the claims invalid because they are stated in terms of function, are anticipated, and lack patentable novelty.

As to the functional character of the claims, claim 1 calls for a capillary "proportioned as to length and diameter relative to the capacity of said compressor, condenser and cooling unit as to restrict the flow of refrigerant and maintain the transmission to the cooling unit at a predetermined rate, said capillary tube connecting with the cooling unit and condenser."

Claim 2 describes a capillary tube "of such length and diameter as will maintain a predetermined ratio between the pressures in the condenser and the evaporator

during the operation of the compressor whereby a mass of liquid is maintained within substantially predetermined limits at all times in said evaporator during normal operation."

Claim 3 requires a capillary tube such as will maintain the predetermined ratio described above "and minimize any tendency of the tube to clog, the said parts of the refrigerating machine and the refrigerant charge being so co-ordinated that the single capillary tube is adapted to function as the regulating device of the flow between the condenser and the evaporator and by reason of the said có-ordination the liquid level in the evaporator is maintained between narrow limits."

■ These portions of the claims describe not the structure, but the function or purpose to be achieved by the tube. This practice has recently been condemned. General Electric Co. v. Wabash Appliance Corporation, 304 U.S. 364, 371, 58 S.Ct. 899, 82 L.Ed. 1402; United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 234, 63 S.Ct. 165, 87 L.Ed. 232. The patentee cannot broaden his claims by describing the product in terms of function. As pointed out by the trial court, long experienced in patent cases, it would be impossible for a court to decide in terms of these claims what constitutes infringement. The patent describes certain results, but does not tell how they are obtained. The District Court did not err in holding the claims invalid for this reason.

■ As a result of describing the device in terms of function, the claims fail properly to describe the device as required by § 4888, R.S., Title 35, U.S.C. § 33, 35 U.S.C.A. § 33. This fault was emphasized by appellants' expert, who stated that it was necessary to correlate the length and bore of the tube to all of the other factors involved in the application of it. In explaining this he said that the diameter must be large enough so that it would not get choked by foreign material, or require an unnecessarily long tube, and that it must be correlated with the amount of refrigerant desired, the high-side volume and the low-side volume of the system and the capacity of the compressor. When pressed by the court to state whether these problems could be solved mathematically, appellants' expert stated that it was largely a question of experimenting. It is evident, therefore, that the patent does not inform persons skilled in the art as to the precise dimensions or the mathematical rules which must be applied in order to secure the results described. But this is fatal to the validity of the patent. Timken Detroit Axle Co. v. Cleveland Steel Products Corporation, 6 Cir., 148 F.2d 267.

■ In addition, the patent lacks patentable novelty. The subject matter fails to display "more ingenuity * * * than the work of a mechanic skilled in the art." Sinclair & Carroll Co., Inc., v. Interchemical Corp., 65 S.Ct. 1143, 1145. Every element of the structure is old. The capillary tube is old, and its properties as a conveyor of fluids have been known since 1842.

The gist of the claimed invention resides in inserting the capillary between the condenser and the evaporator, to restrict and regulate the flow of the refrigerant. The basic idea of restricting the flow from condenser to evaporator is old in the art. It was disclosed in Matthews' "Elementary Mechanical Refrigeration," published in 1912. Matthews, in illustrating the compression system of refrigeration, describes a figure comprising a condensing coil and a heating or expansion coil with the passage between the two "contracted to a sufficiently small cross section to maintain a higher pressure in the condenser coil than in the expansion coil, the compressor being in operation." He points out that "The gas, instead of expanding behind a piston, is allowed to escape through a restricted opening * * * into the expansion coil below, in which a considerably lower back pressure is maintained through the efforts of the compressor which is constantly drawing gas from the lower coil and discharging it into the upper coil." In passing the restricted opening, the conditions of temperature and pressure of gas drop to the original temperature and pressure. This restricted opening or orifice described by Matthews is the equivalent in function of the restrictor tube or capillary. As stated by one highly qualified expert, the orifice and the tube do not differ in principle.

The Carpenter structure is anticipated in varying degrees by McVicar & White, British patent 11,177 (1896); Audiffren, 764,515 (1904), and Jaeger, 1,470,574 (1923), all prior to Carpenter. While the problem sought to be solved in McVicar & White is one of heat exchange, the drawings disclose a helically coiled tube between the condenser and the evaporator.

Audiffren was not cited in the Patent Office. It discloses a hermetically sealed mechanism in which the refrigerant is fed to the evaporator through a pipe of such size "that it will only permit of the passage of the necessary quantity of refrigerating liquid." Jaeger discloses four small tubes leading into the evaporator, the function of which is to "act as expansion valves or devices that make unnecessary the use of the ordinary expansion valves." Since the capillary makes unnecessary the use of the expansion valve, it is plain that the small tubes in Jaeger in this respect function exactly as the capillary tube in Carpenter.

Appellants claim that Jaeger is inoperative. Although this point was vigorously pressed in the Patent Office, the Board of Appeals, in its four decisions upon this question, refused to make such a finding, declaring that "We do not consider it inoperative." On the trial of this case, a refrigerator with a Jaeger evaporator was produced in open court and operated from day to day. It manufactured ice cubes, and the court specifically found that the machine was operative, and stated that it worked successfully. Appellants' expert admitted that the Jaeger tubes interposed a certain resistance to the flow.

Appellants urge that these patents are not to be considered because it is not shown that they ever went into commercial use. Audiffren, however, was patented in all of the principal countries of Europe, as well as in the United States, and had a considerable sale. Matthews discusses this machine in his text book, and several of them are described in detail and photographed in a German catalogue published in 1915. But commercial use is not made by the statute (Title 35, U.S.C., § 31, 35 U.S.C.A. § 31) an element testing patentability. The statute reads that any person who has invented any new and useful device "not patented or described in any printed publication in this or any foreign country, before his invention * * * may * * * obtain a patent therefor." The prior patenting of an invention is an absolute bar to the issuance of a valid patent for the same invention. Western States Machine Co. v. S. S. Hepworth Co., 2 Cir., 147 F.2d 345.

If we are in error as to the relevance of McVicar & White, Audiffren and Jaeger, the Carpenter patent is clearly void for lack of patentable invention over Keyes, 1,293,469, 1,622,520, and 1,622,521. Appellants agree that these patents, issued long prior to Carpenter, disclose the use of capillary tubes for exactly the same purpose as the patent in suit. The tube is designated as a capillary, and stated in Keyes, 1,293,469, to be of "small cross section so as to enable the pressure to rise to a point at which liquid actually collects." The capillary described enters the inlet tube which leads directly from the condenser, thus permitting "a clear drain of the reservoir or intermediate chamber." In 1,622,520, it is stated that the capillary tube functions to deliver the refrigerant at a rate proportional to the difference in pressure between the condensing chamber and the pressure of the refrigerating coil or chamber. No. 1,622,521 also uses a capillary to feed the refrigerant from the condenser to the evaporator. The specification states that the liquid passes from the capillary to the bottom of the expansion or refrigerating chamber, and the volume of liquid delivered by the capillary is controlled by three variables, the diameter and length of the capillary and the pressure difference. In each of these three patents the sole control of the flow of liquid refrigerant to the evaporator is the capillary tube.

Appellants do not deny these facts, but contend that since these patents cover absorption instead of compressor machines they have no bearing. Absorption machines do not have a mechanical compressor. They operate through an absorber-still, which creates the suction by which the vapor is withdrawn from the evaporator and forced into the condenser. This distinction apparently had some weight with the Board of Appeals, for after repeatedly rejecting the application, it suggested that Carpenter redraw his claims to make them apply to the compressor and flooded type of machine. We think that for the purpose of this suit the distinction between the machines is without a difference. As pointed out by Matthews in his text book, "the absorber of the absorption machine performs the function of the suction stroke of the compressor in the compression system, and the generator that of the compression stroke." He states that the remaining portion of the cycle, including expansion at the restricted opening and evaporation in the expansion coil remain as in the compression system. It is uncontroverted that the suction created by the absorber corresponds exactly to the suc-

tion created by the compressor and the forcing of the vapor into the condenser in the absorption system achieves the exact result secured by the piston in the compressor. Also it is admitted that the fact that the machine is flooded, that is, one in which the liquid refrigerant is kept at a sensibly constant level instead of comprising a dry system in which the liquid is progressively vaporized, is immaterial. Appellants' expert concedes that the capillary functions with the dry system. As stated by one of the experts, the capillary has no way of distinguishing whether it has been fed from an absorption system or a compressor system, or whether the liquid is destined to be vaporized. In each instance it performs the identical function of restricting the passageway between condenser and evaporator so that there is a barrier between the "high side" and the "low side." Obviously it involves no invention to take the capillary tube employed for the identical purpose in Keyes and place it in a machine which is operated mechanically through a piston.

█ The capability of the capillary to compensate for changes in pressure induced by changes in temperature, described above, is relied on by appellants as establishing patentability over all of these prior art devices. This feature is not described nor taught in Carpenter, but is evident in various devices employing the capillary tube. Appellants vigorously contend here that this is the outstanding accomplishment which distinguishes Carpenter from Keyes; that it cannot be obtained with the Keyes devices, and that the three Keyes patents therefore have no application. The record, however, does not support this contention. It is true that the compensating feature which exists was not understood at the time of the application for the patent; but the evidence here shows that it is not inherent in the Carpenter, as distinguished from the Keyes, mechanisms. The applications for the Keyes patents were made in 1918, 1920, and 1921, and contemplated the use of ammonia as refrigerant. The Carpenter mechanisms used methylchloride. It is conceded that Freon, which became commercially available in 1935 and was used in a majority of household units in 1941, has chemical properties very different from those of ammonia, and that the compensation for changes in pressure is secured and enhanced by the use of Freon. As testified by experts for both parties, the result is secured mainly by the formation of bubbles of gas in the capillary, which increases in the summertime, and therefore compensates for the increased flow due to higher temperature and higher pressure. Ammonia has a much lower rate of volatilization than Freon, and forms much less vapor in the liquid line. Due to these circumstances and the larger volume of Freon which is circulated, gas is flashed off in the capillary to a much greater extent in machines employing Freon than in machines using ammonia. Keyes testified categorically that if the same refrigerant were used in his machine, the same result in equalization of flow would be obtained. We therefore conclude that the ability of the capillary to compensate for changes in temperature and pressure is due not to the capillary as such, but to the flash-off of gas in the capillary, and would be manifested in Keyes if Freon or some other more volatile refrigerant were used. Even assuming that if Carpenter had discovered the capillary he would be entitled to a patent, he did not discover it. He selected a known mechanical device to meet known requirements, and that "is no more ingenious than selecting the last piece to put into the last opening in a jig-saw puzzle. It is not invention." Sinclair & Carroll Co., Inc., v. Interchemical Corporation, supra. Keyes directly presents every element of patentability claimed to exist in Carpenter.

The judgment is affirmed.