## FRANK B. KILLIAN & CO. v. ALLIED LATEX CORP.

No. 209, Docket 21941.

United States Court of Appeals Second Circuit.

Argued March 8, 1951.

Decided April 30, 1951.

———◆———

Asher Blum and George E. Middleton, New York City, for appellant.

Dean, Fairbank & Hirsch, New York City, Morris Hirsch, New York City, and B. D. Watts, Cleveland, Ohio, for appellee.

Before L. HAND, Chief Judge, AU-GUSTUS N. HAND and CLARK, Circuit Judges.

L. HAND, Chief Judge.

The Allied Latex Corporation appeals from a judgment, holding valid and infringed Claims Nos. 1, 8, 9, 11, 15, 16, 17, 18, 19, and 20 of Patent No. 1,605,445, issued to Fred L. Killian, on November 2, 1926; and Claims Nos. 2, 3, 4, 5, 6, 7, 11, 14 and 15 of Patent No. 2,128,827, issued to the same patentee, on August 30, 1938.

### The "Bead-Roller Patent."

The claims of the first patent are the same as those which we had before us and held valid and infringed in 1934;[1] and we may refer to our opinion in that case for a description of the patented machine. The Eighth Circuit also held the same claims valid in 1939;[2] and Judge Westenhaver in the Northern District of Ohio held them valid in two unpublished opinions. Concededly, the nearest approach to Killian's disclosure is Hadfield's Patent No. 1,097,917, which issued on May 19, 1914, more than eleven years before the date of the application for the patent in suit. In all the former actions the defendants appear to have principally relied, not upon the disclosure of Hadfield's patent, but upon a prior use of his machine, which

the district judges uniformly found that the evidence did not sustain: a finding which the Eighth Circuit and we affirmed. Having done so, we said that it seemed to be "conceded that the Hadfield machine was better than the machine of the Hadfield patent and the nearest thing in the art to the machine of the Killian patent", and we concluded that, "if the machine was not" —an anticipation—"neither was Hadfield's patent." 73 F.2d 55. With deference, that was a non sequitur, for we had disposed of the machine by discarding it as an established prior use, and without considering how nearly it anticipated the patent. In the case at bar the Hadfield patent alone is in evidence; and upon inspection it at once appears that Killian's variants upon it, unless we consider the elimination of one of the two brushes, were trivialities of design: i. e. in the means by which the "forms" were frictionally rotated, and were held upon their supports against the lifting actions of the brush. It is not conceivable that any court would have regarded these as patentable, had the Hadfield patent made any impress on the art; and only because it had not done so did Judge Westenhaver refuse to treat it as an anticipation. This appears from the following passage: "Whether an apparatus constructed in accordance with the Hadfield patent would have operated, I do not know. * * * The device as disclosed * * * I think would not have operated. Be that as it may, here was a patent applied for in January, 1912, issued in 1914, and never went into general or commercial use. It remained, so far as the record shows, a paper patent. With all the industry needing and calling for the Killian apparatus, all manufacturers continued for fourteen years using hand labor, wholly uninfluenced by the existence of Hadfield. It is apparent that Hadfield brought to the industry nothing. His patent did nothing to carry forward the useful arts." (The plaintiff at bar does not challenge the operativeness of Hadfield's patent.) We in our turn took substantially the same view, so far as we considered Hadfield's patent

1. Stevens v. Carl Schmid, Inc., 2 Cir., 73 F.2d 54.

2. Dean Rubber Manufacturing Co. v. Killian, 106 F.2d 316.

at all; we said on page 56 of 73 F.2d: "that Killian's conception was within the skill of any good mechanic is refuted by the fact that the art felt the need of a machine, but continued to roll beads by hand until Killian arrived."

■ It is true that, when a substantial period has passed between the appearance of an earlier disclosure and the application of the patent in suit, the reasoning which we have quoted has been again and again applied. We have ourselves often used it:[3] moreover the Supreme Court appears still at least to countenance that approach.[4] On the other hand, as we said in Condenser Corporation v. Micamold Radio Corporation, supra, 145 F.2d 879: "The lapse of time between one invention and another of itself tells very little. * * * lapse of time alone is no test of the difficulty of taking a last step, until it appears that the art in fact knew the earlier steps, already taken." Countless patents lie in patent offices, in fact unknown either because they were premature, or were not exploited, or because all their uses were not foreseen; yet an inventor is charged with an acquaintance with all of them. So far as they in fact anticipate his invention they stand on precisely the same footing as though he had had them before him. The fact that the art has not profited by them is irrelevant unless it also appears that they were generally known; and they are then relevant only in so far as they may indicate that the originality, necessary to step from them to the invention in suit, does not appear to have been part of the equipment of others versed in the subject matter. The phrase, "paper patent," is a mere bit of rhetoric, usually employed as a makeweight by judges who wish to support the patent in suit, but are embarrassed by a reference, of an escape from which they are not too confident. It is a meaningless platitude.

■ Assuming, as we will, that automatic "bead rolling" would have been as desirable before the advent of latex as it became later, there were nevertheless obstacles to the manufacture of "prophylactics" in 1912 which had, or at least may have, largely disappeared by 1925. We said in Stevens v. Carl Schmid, Inc., supra, 55,[5] of Hadfield's machine: "its continued operation was prevented by public authorities in 1912 because of the character of the articles that were being manufactured"; and we do not know for how long that opposition continued to be strong enough to make it undesirable to use such machines with the inevitable publicity that would follow. That was one reason why Hadfield's machine was "dismantled and abandoned for fourteen years until the litigation in Ohio furnished occasion for recollection of it"; and the eleven years that passed warrants no stronger inference of patentability than does a comparison of the two. We agree with Judge Westenhaver that Hadfield did not "enrich the art"; but we cannot agree that this justified the conclusion that Killian's invention was patentable. To this there is possibly one theoretical exception: Killian only disclosed, and all his claims were limited to, a single brush, while Hadfield disclosed two. Only one is necessary, and as a new question we could not support a patent upon the omission of one of Hadfield's two. Nevertheless, it so happens that in all the earlier actions the infringers used a single brush; and the invention, supposing it can be thought to have been an invention at all, was entitled to the narrowest of all equivalents. Thus it become possible to decide this action upon the issue of non-infringement without actually overruling any of the past decisions. Moreover, since the patent has long since expired, none of those objections apply to that course, which have been raised in the

3. O'Rourke Engineering Construction Co. v. McMullen, 2 Cir., 160 F. 933, 938; B. G. Corporation v. Walter Kidde & Co., 2 Cir., 79 F.2d 20; Patent Royalties Corp. v. Land O'Lakes Creameries, 2 Cir., 89 F.2d 624, 627; Condenser Corporation v. Micamold Radio Corporation,

2 Cir., 145 F.2d 878, 879; Safety Car Heating & Lighting Co. v. General Electric Co., 2 Cir., 155 F.2d 937, 939.

4. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 278, 279, 64 S.Ct. 593, 88 L.Ed. 721.

5. 73 F.2d 54.

case of living patents, for the claims will not remain *in terrorem*. The judgment will be reversed, and the complaint upon the first patent will be dismissed for non-infringement.

### The "Distributing Patent."

Judge Bondy has described this patent in his opinion in the district court [6] fully enough to serve as an introduction to our discussion of the questions involved. Killian's specifications state that the machine is to make "thin rubber articles, such as rubber balloons, finger cots, nipples, rubber gloves," and it has in fact been used to some extent to make balloons; but it is agreed that the only important use of it and other such machines is to make the "prophylactics," which have come to be manufactured in enormous quantities during the last twenty years. The disclosure does not indeed confine the machine to the use of pure latex; it extends to "liquid latex or rubber cement," to "natural or partly coagulated rubber latex"; and to a "rubber latex partly reduced by a coagulated process to a desired consistency, or in the form of a cement consisting of rubber dissolved in naphtha or other solvent." However, the testimony of the plaintiff's expert witness makes it clear that in the manufacture of "prophylactics" only pure latex is desirable, or indeed possible, if the necessary thinness is to be achieved. The "coagulent process" is not "practical for thin rubber articles; that is, very thin rubber articles"; by which the witness meant those of about six thousandths of an inch. So far as he knew that process had never been "used for the commercial production of prophylactics"; indeed, he did not think that the machine "would work satisfactorily in its present form with a solvent." Latex did not, however, begin to come into this country until 1920; nor was it until 1924 that it was imported in substantial quantities. After that the tonnage grew, somewhat unevenly, until in 1930 when it amounted to nearly 4,500. Just what use the arts made of it in the ten years between 1920 and 1930 does not appear; there were a good many patents, some eight of which are in evidence and several of which were for its use without a coagulent. Yet it was apparently only in 1926 that "latex articles that had been developed were being offered for sale," and "prophylactics" of "latex as distinguished from dipped rubber cement" did not appear until 1931 or 1932. It would therefore be unsafe to assume that there was a "surplus" available for use for "prophylactics" before 1928, or at the earliest, 1926. On the other hand throughout this period, whether it was four or two years, between its first availability in quantity and 1930, the demand for "prophylactics" must have been substantially as great as it is now; and Killian is entitled to whatever merit is due to the first person who satisfies a long existing need. Moreover, presumably he designed his machine from the ground up and without suggestion or cue; and we may well agree that, taken as a feat, that displayed enough originality to support a patent. However, as we have just said in disposing of the "Bead-Rolling Patent," the law does not use such a subjective test in judging a patent; on the contrary it imputes to the inventor an omniscience which will again and again deprive him of the reward that his talents as an individual might otherwise deserve. That is a corollary of a monopoly, not limited to plagiarists.

In the case at bar there appeared in 1917 a Dutch patent, which disclosed a machine closely parallel in structure to Killian's, and to him must be imputed an acquaintance with it. It is true that the two machines were not identical and their purposes were widely different, for the Dutch patent was designed to make "rubber balls" of latex, apparently for ease in shipment. Nevertheless, with one exception they are so far alike that the Dutch machine could have been substituted for the patent in suit after changes that certainly could not of themselves sustain a patent. Killian, disclosed a series of arms at each side of his conveying belt, and he replaced the "sticks" of the Dutch patent with "forms," which had been a commonplace in the art of making "prophylactics" for nearly twenty

6. 94 F.Supp. 281.

years; on neither of these can he depend. On the other hand he did add the feature that, after a "form" had been dipped in its bath of latex and had been raised back again to horizontal, it was raised, still rotating, above the horizontal, so as to insure a more uniform spread of latex. The Dutch patent did not disclose that step and did not need to, because uniformity of distribution was no part of its aim, any more than curing the latex in a smoke chamber was part of Killian's aim. In 1921 Mitzel disclosed a machine for making "rubber articles" on "nipple forms," consisting of a conveyor belt, carrying a series of "nipples." These were first inverted and immersed in a "dipping chamber," where they were coated with a liquid solution of rubber; after which the conveyor carried them in a drying chamber, in which through a devious course they were alternately inverted and raised upright. The purpose of these changes of position was the better to distribute the rubber over the surface, and thus to make the "article" of a uniform thickness. However, the "nipples" were not rotated, evenness of distribution being effected only by the inversion and reversion we have described. Nevertheless, had an inventor, bent on adapting the Dutch machine to the manufacture of "prophylactics" found that rotation of the "forms" at horizontal resulted in an uneven thickness, he would have been a curiously sluggish experimenter, if with Mitzel before him, he did not try out the effect of the method Mitzel disclosed.

The case therefore comes down to this: How much insight was required to observe that the Dutch machine could be used for the new purpose. That insight once achieved, the necessary adaptations were easily within the reach of ordinary perseverance. The Dutch specifications as they read gave at least an intimation of their possible use for making thin sheaths, although their purpose was, as we have said, only to make "rubber balls." That appears in the following passages. "The stick is successively immersed in a similar manner * * * so that after a certain length of time a good sized ball of raw rubber has formed at the end of the stick where layer upon layer of latex has coaguated." Again, "The latex coagulates very rapidly: a stick, on leaving tunnel, m, arrives above receptacle, s, containing latex and is again immersed in order to collect a fresh layer of latex. This process is repeated * * * until rubber balls of proper size have formed around the latter" (the "sticks"). That is the description of a series of superimposed thin layers of latex, their number being whatever will produce a ball of "proper size." Each immersion added a layer; the number of layers depended upon how big a "ball" one thought "proper." Stop the "process" at two immersions and a "prophylactic" results: that, coupled with the mechanical changes that we have mentioned, is the full measure of all that can be attributed to Killian. We cannot agree that, if an inventor wished to supply the market with such articles and had the Dutch disclosure before him, this step demanded that degree of exceptional endowment which—especially in recent years—is necessary to support a patent. All that was needed was to stop the repetition of the "process" of imposing "layer upon layer of latex" at the right thickness. Even if the time had been much longer between the commercial availability of latex and the date of Killian's application, we should hesitate to hold that such a discovery was enough. As in the case of Hadfield's patent, we should have to be satisfied that the Dutch machine had been widely known in the art; a most unlikely possibility. As we have said, the inventor must justify his contribution against all that has gone before, known and unknown. Yet when he seeks to use the art's failure to anticipate him as evidence of his own perspicacity, he must appraise the art's ineptitude by the art's actual knowledge; he may not impute to it an acquaintance with any part of what went before of which it was not aware. It may result that he will benefit the art by a discovery of what it had practically never possessed or had possessed and lost. But there is no room for "lost arts" in the case of inventions, "described in printed publications in this or any foreign country";

the statute is plain and inexorable.[7] As to the second patent also the judgment must be reversed and the complaint dismissed.

Judgment reversed; complaint dismissed.

7. Zephyr American Corp. v. Bates Manufacturing Co., 3 Cir., 128 F.2d 380, 385; Western States Machine Co. v. S. S. Hepworth Co., 2 Cir., 147 F.2d 345, 350; Rice v. Nash-Kelvinator Corp., 6 Cir., 150 F.2d 457, 461; In re Phipps, 154 F.2d 116, 118, 33 C.C.P.A.,Patents, 861.