## VAN DER HORST CORP. OF AMERICA v. CHROMIUM CORP. OF AMERICA.

United States District Court
S. D. New York.
June 19, 1951.

Jeffery, Kimball & Eggleston, New York City (J. Stanley Preston, New York City, Jerome G. Lee, New York City, of counsel), for plaintiff.

Burgess, Ryan & Hicks, New York City (Newton A. Burgess, H. H. Hamilton, New York City, of counsel), for defendant.

IRVING R. KAUFMAN, District Judge.

Plaintiff, owner of patent No. 2,412,698 issued December 17, 1946 sues for infringement of claims 4, 6, 9, 13 and 22 to 27 of the patent. Hendrik van der Horst, President of the plaintiff corporation, is the inventor named in the patent and plaintiff's assignor, and the patent states that the invention "relates to chromium wearing surfaces, i. e. surfaces subject to friction, and especially cylinder bores."

Dr. van der Horst apparently has been working in the field of chromium surfaces, which are hard and therefore good wearing surfaces, for many years. He patented a chromium surface for pen point tips in Holland in 1933 and one for chromium plated needles in the same year in Great Britian. At about that time he also applied for a patent covering a method of chromium plating the cylinder bores of internal combustion engines, and a patent was issued on this method in the United States on July 21, 1936, numbered 2,048,578.

However this coating of solid or "dense" chromium on cylinder bores was not the ultimate of perfection because of a certain "picking up" action whereby pieces of chromium are torn away from the surface of the cylinder bore and as a result the chromium wears out more rapidly than is desirable.

On March 23, 1943 a patent was issued in the United States covering a method of producing chromium wearing surfaces that would be longer wearing and would avoid the "picking up" action. According to this patent, numbered 2,314,604 and hereafter designated the "process patent", after the chromium is electroplated onto the engine cylinder bore, the current is reversed in the plating bath or electrolytic solution so that the chromium plated cylinder becomes an anode. This "anodizing" or reverse current treatment causes the formation of numerous grooves, pits or depressions in the surface of the chromium so that under working conditions oil is retained in these depressions, friction is reduced and there is no tendency for the chromium to pick up.

The patent in suit is a "product patent" and covers, generally speaking, grooves, pits and depressions in chromium wearing surfaces. The claims of the patent in suit which it is alleged defendant infringed are as follows:

"4. A member having a surface to engage in moving contact with another member, said surface of the first mentioned member consisting of chromium and the body of said first mentioned member being formed of another material, and there being in the exposed surface of the chromium grooves, pits or other depressions to contain lubricant, the distribution, number, size and depth of said grooves, pits or depressions being at least as great approximately as the distribution, number, size and depth of those grooves, pits or depressions which result from passing a current through an electroplated chromium surface, in an electrolyte, and in such a direction that the chromium is an anode, until from about 150 to about 450 ampere-minutes of electricity per square decimeter of the surface has passed through the surface and thereafter honing the surface to finish.

"6. A wearing member having a face of chromium to operate in frictional contact with another wearing member, there being a multitude of small depressions in said face and the bottoms of at least many of said depressions being irregular, the irregularities of such bottoms being of microscopic dimensions but of sufficient size to be measurable under a magnification of 100 diameters.

"9. A wearing member having a face of chromium to operate in frictional contact with another wearing member, there being in said face a multitude of depressions at least some of which, as observable looking directly at the face, are more than about 0.00015 inch and less than about

0.004 inch in width and few if any are more than about 0.0125 inch in width.

"13. The subject matter of claim 8 characterized by the fact that the major number of said depressions are more than 0.0002 inch deep.

"22. A wearing member having a face of chromium to operate in frictional contact with another wearing member, said face being composed primarily of interspersed plane and major depressed areas, at least many of said major depressed areas having projections rising from their bottoms and forming small cavities.

"23. A wearing member having a face of chromium to operate in frictional contact with another wearing member, said face being composed primarily of interspersed plane and major depressed areas, at least some of the major depressed areas being more than about 0.00015 inch and less than about 0.004 inch in maximum width.

"24. A wearing member having a face of chromium to operate in frictional contact with another wearing member, said face being composed primarily of interspersed plane and major depressed areas, at least some of the major depressed areas being less than about 0.004 inch in maximum width and the widest being between about 0.002 inch and about 0.0125 inch in maximum width.

"25. A wearing member having a face of chromium to operate in frictional contact with another wearing member, said face being composed primarily of interspersed plane and major depressed areas, the major depressed areas being of various widths, the narrowest of them being between about 0.0001 inch and about 0.004 inch in maximum width, and the widest of them being between about 0.002 inch and about 0.0125 inch in maximum width.

"26. The subject matter of claim 22 characterized by the fact that the said major depressed areas occupy between six percent and seventy-five percent of the total area of the face.

"27. The subject matter ·of claim 22 characterized by the fact that at least the larger number of said major depressions

are between about 0.0001 inch and about 0.003 inch deep."

## I. Infringement

■ The first question to be determined is whether defendant infringes. In the case of Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, the Supreme Court stated that: "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If the accused matter falls clearly within the claim, infringement is made out and that is the end of it." 339 U.S. at page 607, 70 S.Ct. at page 855.

■ However, even if there is not exact duplication, infringement may still be established. As Mr. Justice Jackson, speaking for the Court, continued in the Graver case, 339 U.S. at pages 607–609, 70 S.Ct. at page 856:

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

"The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. * * *

" 'To temper unsparing logic and prevent an infringer from stealing the benefit of an invention' a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147. The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. * * * Today the doctrine is applied to mechanical or chemical equivalents in compositions or devices. * * *" See also Walker on Patents, Sections 464–480.

The alleged infringing devices in this action are two engine cylinders, plaintiff's Exhibits 8 and 9, which the Court finds were plated with porous chromium (i. e. chromium with depressions) by the defendant. Plaintiff's Exhibits 37 and 38 are photographs of portions of the surfaces of one of these cylinders (Exhibit 9) at 50 magnifications, and Exhibits 23, 24, 26, 27, 28 and 29 are plane and cross-sectional photographs of areas of the other cylinder (Exhibit 8).

With the aid of a simple ruler (divided into tenths of an inch) it is apparent that the depressions in defendant's cylinders infringe upon the dimensions and descriptions of depressions found in claims 6, 9, 13 and 22–27. The defendant's depressions are mainly towards the upper limits and to some extent beyond plaintiff's ranges of sizes, but since few depressions are more than about .0125 of an inch in width, the defendant technically infringes upon the ranges of sizes and depth of the depressions as specified in plaintiff's claims enumerated above. Claim 4 will be dealt with later.

Before concluding the subject of infringement, I believe it appropriate to discuss at this point the development and substance of defendant's product.

Defendant has been producing various chromium surfaces for many years. In about 1933 or 1934 the defendant started experimenting with various types of porous chromium surfaces, and the porous or grained surfaces were produced by roughening the chromium by grit blasting or emery cloth or with acid. As defendant's Exhibit D, written in late 1934 or early 1935, and the testimony indicate, defendant also tried reversing the current to make the chromium porous.

The defendant eventually adopted the method of blasting the base surface (not the chromium) with sand, grit or chilled iron in various sizes and then plating with chromium so as to reproduce the base metal depressions in the chromium, and then polishing lightly. It was recognized by the defendant that the porous chromium surface would prevent scoring and seizing (Exhibit A), and that "a roughened surface yet smooth to the hand should also be good in connection with any scoring problems, as on plungers, pistons, homogenizer rods, rams and liners for diesels". (Exhibit C, dated December 2, 1938.) The "liners for diesels" are simply engine cylinders similar to the alleged infringing products.

The defendant in the years 1936 to 1939 produced porous chromium surfaces commercially on wearing surfaces such as press rolls, suction box covers, slasher cans, and though it produced and sold some engine cylinder liners using only smooth chromium (as indicated in Exhibit C), it was contemplating roughening the surface of chromium plated engine cylinders and was ready to sell such cylinders. (Exhibits C, FF, Record pp. 203–205.)

Ralph E. Cleveland, Plant Manager of the defendant since 1927 and also at present its Vice-President, patented a porous chromium surface for "press rolls" in patent No. 2,114,072 dated April 12, 1938 (hereafter referred to as the "Cleveland patent"). On July 8, 1941, a patent number 2,248,530 was issued to Cleveland and one Edson Raymond Granger, who also worked for the defendant, on porous chro-

mium metal antifriction surfaces (hereafter called the "Granger patent").

Defendant offered "custom made" grained chromium finishes in any grade from smooth and bright to extreme coarseness (Exhibit EE, dated February 12, 1935). The grit sizes used ranged from No. 4 grit to No. 150 grit, with No. 12 being the size most frequently used. The defendant had grained surfaces for cylinder walls for internal combustion engines in mind at an early date, at least as early as 1938 (see Exhibits C and FF) but did not commence substantial commercial production of such cylinders until 1942 because it was comparatively expensive to produce porous chromium plated liners.

Defendant contends that the alleged infringing cylinders were produced by *exactly* the same method used by it since 1935; that it was blasted with No. 12 grit and then chromium plated and polished lightly; and that its present method is the same as is disclosed by the Cleveland patent and expanded upon in the Granger patent. I find that this contention is true.

Plaintiff does not dispute the fact that defendant uses a blasting method as distinguished from the reverse current method, but alleges that the dimensions of the depressions disclosed in the Cleveland patent are different from those found in the infringing products and that therefore the infringing products were not made in accordance with the Cleveland patent.

The dimensions of depressions disclosed in the Cleveland patent are "indentations ranging in diameter from about 0.005 to 0.04 inch and in depth from about 0.002 to 0.02 inch." The diameter dimensions above obviously overlap the dimensions as expressed, for example, in claim 9 of the patent in suit, and the depth dimensions of claim 13 encompass the range of Cleveland's dimensions. Furthermore the significant or major depressions of the infringing surface come within the Cleveland patent specifications.

The Court has carefully examined the Patent Office file wrappers of both the plaintiff's process and product patent in order to ascertain how the product claims were passed by the examiners in light of the Cleveland patent. Despite such examination the answer remains a mystery, though the most likely reason is the undaunted persistence of plaintiff's able counsel.

In the process file wrapper the plaintiff asserted a claim for "a cylinder of which the bore is coated with a layer of chromium in the surface of which are formed numerous small grooves, pits or depressions adapted to retain oil." (Exhibit S, p. 7.) This claim was rejected as failing to define patentable subject matter.

Claims were then added, among which were the following, as renumbered (Exhibit S, pp. 17–18) :

"12. A wearing member having a wearing surface consisting substantially of chromium and in which are numerous small grooves, pits or depressions.

"13. A wearing member have a wearing surface formed substantially of chromium and a body formed of another material, and in which wearing surface are numerous small grooves, pits or depressions.

"14. A wearing member having a wearing surface formed of chromium and a body formed of another material, and in which wearing surface are grooves, pits or other depressions which, in number, size and depth, are at least of the order of the grooves, pits or other depressions which result from treating an electroplated chromium surface to a reversed current for from 150 to 450 ampere-minutes and then honing to finish."

These claims were rejected by the examiner as being "fairly anticipated by Cleveland." (Exhibit S, p. 22.) The claims were cancelled by the applicant and four other product claims, substantially similar, were added, numbered 23, 24, 25 and 33. (Exhibit S pp. 34–35, 37.) These claims also were rejected by the examiner on the basis of the Cleveland patent among others. Counsel for van der Horst then submitted an affidavit in which he alleged that the Cleveland depressions were so distinct from the applicant's that the "difference in size from Cleveland is in effect a difference in kind." (Exhibit S, p. 49.) However the examiner's rejection was reaffirmed with the statement that "the dis-

tinctions (between Cleveland and applicant) relate primarily to the method by which the grooves and pits are produced and not to any real substantial difference in the structure of the article. Since method limitations cannot be relied upon to impart patentability to claims which are otherwise anticipated, such remarks and contentions have no particular import." (Exhibit S, p. 56.) Claims 23, 24, 25 and 33 were then withdrawn. At the same time an affidavit was submitted on behalf of the applicant by Dr. Walter R. Meyer, an expert in the field of electrochemistry, in which he at great length differentiates the Cleveland patent as follows:

"*The Cleveland patent No. 2,114,072* also, in my opinion, has no relation to the van der Horst process or product. Cleveland alleged, and it seems rasonable, that if the face of a press roll of a paper-making machine, which rolls on the wet paper stock, is formed with indentations, these indentations will trap air locally between the roll and the wet paper, and the trapped air in turn will prevent the roll picking up the paper. He therefore proposes to use a roll plated with chromium and numerously indented on its face but otherwise smooth. He appears to have chosen chromium because of the hardness and smooth surface of plated chromium and its noncorrosive nature. Cleveland refers to the surface as porous. Subsequently he describes the proper indentations as those running from .005 inch to .040 inch in diameter and about half that in depth. This shows the degree of 'porosity' contemplated by Cleveland. He produces the roll by first making a smooth roll of base metal, e. g. steel, then sandblasting its surface to produce the numerous indentations, and then electroplating the surface with chromium. The chromium plate tends to follow and reproduce the indentations made initially in the base metal. As an alternative to sandblasting, Cleveland may etch the surface of the steel or other base metal 'by suitable chemicals' to produce the initial indenting. The acid etching in this case (i. e. in contrast to etching for microscopic metallographic examinations) is a deep etching to produce noticeable prominences and valleys, allegedly differing somewhat in character from the hills and valleys of sandblasting, but evidently they are to be of the same general order as to size, namely from .005 inch to .040 inch and about half that in depth.

"This is the whole of the disclosure of the Cleveland patent, and to repeat, I can see no relation between it and the van der Horst process or product, or how either one can suggest or be deduced from the other. Clearly the Cleveland patent does not disclose or suggest the van der Horst electrolytic process. Further, the two products are entirely different. As against Cleveland's generally hemispherical indentations between .005 and .040 inch in a diameter and half that in depth, the van der Horst product has, as I have described, a complex network, or set of interlaced networks, of crevices of a maximum width of the order of .0005 inch, of variable lengths but uniformly many times longer than their widths, and of depths four and usually more than four times their widths. Bare observation of the two photomicrographs on page 5 of the applicant's letter dated March 7, 1942 in the application is sufficient to show the entire dissimilarity of the van der Horst product from that prescribed by Cleveland and the difference in form between the indentations and the crevices. These differences in form and dimensions represent vastly greater differences in reality than may at first appear. First, the average diameter of Cleveland's indentations (.040 plus .005 divided by 2) is .0225 inch. As against this the average width of the van der Horst crevices observable in the photomicrograph at the top of page 5 of applicant's letter previously referred to (and there are indications that a higher magnification would reveal crevices even finer than any measurable in that picture) is (.0005 plus .00006 divided by 2) of the order of .00028 inch,—a difference of the order of 100 to 1. Second, with an average diameter of about .0225 inch, Cleveland can have not more than about 44 indentations per linear inch of surface, and with this close packing of the indentations only something like one-fifth of the original surface of the chromium remains in place to sup-

port a load. As against this, the photomicrograph at the top of page 5 of applicant's letter previously referred to, reveals about 1300 crevices per linear inch when counted in one direction and about 1600 per linear inch counted at right angles thereto, and something near one-half of the original surface area remains standing to sustain any load to be imposed on the plate. Third, as against Cleveland's ratio of average indentation mouth width to depth of 2 to 1, the ratio of the average van der Horst crevice mouth width to depth is 1 to considerably more than 4. Fourth, the difference in form in depth (i. e. as seen in a cross-section) between the indentations of Cleveland and the crevices of van der Horst is important when the utility that van der Horst discovered for his surface is considered. Necessarily due to their mode of formation, e. g. by sandblasting, and the proportions prescribed for them, the indentations of Cleveland tend, on the average, to the hemispherical,—broad at their mouths and narrow at their ends. The van der Horst crevices tend to the straight-wall form, perpendicular to the surface of the plate, and of a width at their ends of the same order as the width of their respective mouths.

"These differences are so great, comparatively, as to amount to a difference in kind for the purposes of the van der Horst product, namely as a wearing surface to fit with and run over another surface area repeatedly,—a machine bearing, to use the term 'bearing' in its broadest sense. The straight wall form of opening of van der Horst facilitates honing, i. e. tooling to exact size, fit and superficial smoothness, inasmuch as the straight wall form results in substantially the same area of metal being presented to the tool at all times until the tool has reached nearly to the end of the crevices, should the tooling be continued that far. That is to say, substantially the same facility to honing continues for a considerable distance into the metal. To the contrary, while the roll of Cleveland can be honed at its initial surface with greater facility than a wholly smooth unindented chromium plate, provided his indentations are packed closely, each cut of the tool exposes a considerably greater area of the metal to the next cut due to the indentation narrowing rapidly toward their ends, with the result that the difficulty of honing rapidly approximates that of a smooth unindented chromium plate. * * * The theory of the matter is complex, but stated simply, as contrasted with the Cleveland indentations, the van der Horst crevices are of capillary shape and dimensions, with the result that they absorb oil avidly whenever oil is presented to them and retain this oil during draining periods for subsequent use; assuming that the same quantity of oil is to be retained per unit of superficial area in any instance, the crevices, due to the ratio of their widths to their depths, leave a much larger area of metal standing between them than do the indentations, to sustain the load of the opposite member of the 'bearing', with the result that a creviced 'bearing' is capable of carrying a heavier load, per square inch, than an indented bearing; due to the nature of capillary action, a deep narrow crevice is capable of retaining more of its volume filled with the oil presented to it than a shallow wide indentation of equivalent volume, with the result that, volume for volume, a creviced surface retains materially more oil during a draining period, for subsequent use, than an indented surface; in such cases as engine cylinders for example, a shallow wide indentation presents to the flame of the combustion greatly more of the volume of oil within it than a deep narrow crevice having an equivalent volume, with the result that the rate of oil deterioration is greatly less with narrow deep crevices than with wide shallow indentations, other conditions being the same.

"To repeat, the differences between the wide shallow indentations of Cleveland and the narrow deep crevices of van der Horst are not mere differences of degree and form, but are so vast and of such a nature as to amount to a difference in kind."

Thus it can be seen that the product claims were completely rejected by the examiner in the course of van der Horst's process application.

In the product patent application there reappeared the aforementioned claims 12

420

and 13, now numbered 2 and 3, and also claim 1 which claimed: "A cylinder of which the bore is coated with a layer of chromium in the surface of which are formed numerous small grooves, pits or depressions adapted to retain oil." Exhibit T, p. 12.)

These claims were followed by the claims appearing in the patent in suit.

*All* of the claims were rejected by the examiner. Counsel for the applicant replied to the rejection and cancelled claims 1 to 3 stating: "As to claims 1, 2 and 3, we respectfully submit that the rejection is on inadequate grounds. These claims were used in this application to show formally the connection between this present application and applicant's copending application, Serial No. 270,018 (the process patent application). This purpose having now been accomplished we have cancelled these claims *in view of the Cleveland patent No. 2,114,072."* (Exhibit T, p. 28.) (Emphasis added.)

Several of the claims in suit were rejected by the examiner on the basis of the Cleveland and Granger patents.

Excerpts from the Meyer affidavit used on the process application were submitted upon the product application, including the entire abstract referring to the Cleveland patent, and finally the examiner granted the claims in suit despite his prior rejection of many of these claims.

■ In considering the file wrappers the Court does have in mind the rule in this circuit that the arguments made by the applicant to the examiner cannot be considered in construing claims, though the file wrapper can be examined to determine the question of estoppel through rejected claims. A. G. Spalding & Bros. v. John Wanamaker, 2 Cir., 1919, 256 F. 530. There is substantial authority to the contrary, however, which permits the file wrapper and Patent Office proceedings to be resorted to in order to construe a patent or determine on what distinction over the prior art the applicant was asking to receive his patent. E. g. Wiegand v. W. Bingham Co., 6 Cir., 1939, 106 F.2d 546; Texas Co. v. Anderson-Prichard Refining Corp., 10 Cir., 1941, 122 F.2d 829; Howe v. Atwood, D.C.E.D.Mich.1942, 47 Supp. 979.

The Court of Appeals for this Circuit in the Spalding case disapproved of "looking at preliminary negotiations in the interpretation of a formal document intended to be the final memorial of the parties' intentions." 256 F. at page 534. However, if there exists doubt as to the scope of the "final memorial", what better evidence of the intent of the parties entering into the "contract" (a patent having been said to be a contract), is there than the "negotiations" leading up to the issuance of the patent?

Under the view *not* sanctioned by this Circuit the plaintiff would be "estopped" on the basis of the Meyer affidavit from claiming infringement by the defendant, in view of the Court's finding that defendant's depressions are produced according to the Cleveland method. However, under the view still in effect in this Circuit plaintiff survives the "estoppel" barrier.

Therefore it is my finding that defendant's product infringes upon plaintiff's patent claims (not claim 4) despite the patentee's own assertions in the application proceedings that defendant's product bore no similarity to the patentee's product.

It should be noted at this point that the Court is faced with somewhat of a dilemma on the question of infringement. It has been stated by an independent expert, Mr. Joseph Reach of the Baldwin-Lima Hamilton Corporation, that he can very easily distinguish visually between plaintiff's and defendant's surfaces and that there is a difference in performance of the two products, plaintiff's being superior in function. Plaintiff also has stated that statements in the Meyer affidavit are still valid. Counsel for plaintiff admits that if defendant's product is made in accordance with the Cleveland patent then it does not infringe. I have found that they were so made. Despite these facts I am unable to find noninfringement because by the use of a simple Woolworth's ruler I observe that defendant's depressions *do* come within the mathematical scope of plaintiff's claims. I do believe though that this dilemma empha-

sizes, as will be seen, the invalidity of plaintiff's patent.

## II. Scope of Invention

The claimed invention is that "Dr. van der Horst discovered how chromium can be made universally applicable to engine, pump and compressor cylinders, piston rings, and any other things there may be that are subject to the same type of service and punishment as these things," (p. 5 plaintiff's brief) and that he accomplished this result by providing the face of the chromium with numerous small grooves, pits or depressions of a particular and peculiar character.

Plaintiff concedes that the following were known prior to the patent in suit:

(1) plating chromium as a wearing surface, particularly on engine cylinder bores

(2) deplating chromium with a reverse current

(3) porous chromium, i. e. pits and grooves in chromium, on a wearing surface

(4) honing a surface.

The plaintiff cannot claim as its invention grooves, pits or depressions in the chromium surface of a cylinder bore generally, because this is in substance the original claim 1 applied for in the application of the patent in suit, and this claim was rejected. Plaintiff is estopped by such rejection in accordance with the Spalding case, supra, and where the inventor narrows his claim to get it passed by the Patent Office he cannot subsequently broaden it but is bound by the examiner's decision if he doesn't appeal. I. T. S. Rubber v. Essex Rubber Co., 1926, 272 U.S. 429, 443, 47 S.Ct. 136, 71 L.Ed. 335.

Therefore, as I see it, plaintiff can claim as his invention only: (1) the specific surface produced by the reverse current process and (2) the specific dimension ranges found in the patent.

## III. Scope of Patent

Plaintiff alleges that the patent is limited solely to engine cylinders and objects subject to the same general operating and wear conditions, and supports this allegation by an interpretation of the patent by plaintiff's Vice-President and Chief Engineer, Russell Pyles.

However an examination of the patent shows this not to be the case. The language of the patent is very clear in this respect and needs no interpretation by an expert. All that is required is the reading of simple English. At the outset, the invention is said to relate to chromium wearing surfaces, i. e. surfaces subject to friction, and in the patent specifications it is stated:

"While the invention is described above as particularly applicable to cylinders for engines, pumps, compressors and the like, *it can be applied to chromium or otherwise chromium-faced wearing members of other kinds,* that is to say members tending to wear by frictional contact with co-operating members, where the retention of lubricating oil between the contacting members is desirable, or where the chromium is liable to be picked up, or which require honing to size, etc." (Col. 3, lines 15–25.) (Italics mine.)

"It will be understood of course that *my invention is not limited to the matter as specifically described above* nor to the particular structures illustrated in the drawings except as appears in the claims hereafter." (Col. 6, lines 71–75.) (Italics mine.)

Claim 4 speaks of a "member having a surface to engage in moving contact with another member" and the other claims designate as their subject "a wearing member having a face of chromium."

Thus the subject of plaintiff's patent is much broader than is now claimed and applies to any chromium friction or wearing surface. If plaintiff had desired to limit the subject to engine cylinders it could have done so, as was done in claim 5 which refers to a cylinder bore. Indeed, the specific reference to a cylinder bore in claim 5 and its absence from the claims in suit emphasizes the broad aspects claimed rather than the restricted one now contended for.

It was stated by plaintiff's counsel and its expert, Mr. Pyles, that the patent in suit is so limited in scope that the exact same surface described therein could be used by defendant on such wearing surfaces as slasher cans without infringement. (Rec-

ord pp. 1162, 1165.) It seems clear, therefore, that if plaintiff's patent does apply to wearing surfaces generally, then the Cleveland surfaces and the slasher can surfaces would be anticipation, and the patent claims in suit would thereby be invalidated without proceeding further.

While the courts will at times limit claims which are stated too broadly by language drawn from the specifications, when the patentee has disclosed a meritorious invention, see Western States Mach. Co. v. S. S. Hepworth Co., 2 Cir., 1945, 147 F.2d 345, 349, I question whether the claims in this case are deserving or susceptible of limitation. I have already indicated that the specifications are themselves broad in scope. Had defendant produced reverse current depressions on slasher cans plaintiff could have claimed infringement and pointed to the clear language of the specifications quoted above which states that the invention is limited *only by the claims.* The claims in suit refer to wearing members generally. It should be noted that Dr. van der Horst in a paper on his process patent delivered in 1943 before the American Electroplaters Society stated that his process may be applied to all parts that require lubrication, (Exhibit TTT) not merely to engine cylinders or similar reciprocating parts as now claimed.

In any event even judicial limitation of the claims would not save them as we shall see from a consideration of the scope of plaintiff's claims and their validity.

### IV. Claim 4

As this claim reads, it is definitely tied to the process described in plaintiff's process patent, for it describes the distribution, number, size and depth of those grooves, pits or depressions as they result from applying the reverse current treatment.

Concededly defendant does not use plaintiff's process and therefore defendant does not infringe upon this claim.

Plaintiff admits that claim 4 is the narrowest of its claims in scope (plaintiff's brief p. 6) and it is narrow only because it is tied to plaintiff's process.

Having found non-infringement, there is the question whether the Court should consider the validity of this claim. The decisions in this Circuit are unanimous that if a claim is invalid, especially where it is a "scarecrow" or grossly invalid claim, the Court should so declare. Wabash Corp. v. Ross Electric Corp, 2 Cir., 1951, 187 F.2d 577; Harries v. Air King Products Co., 2 Cir., 1950, 183 F.2d 158; Cover v. Schwartz, 2 Cir., 1942, 133 F.2d 541.

I find that claim 4 is grossly invalid on its face because of indefiniteness and therefore a "scarecrow" claim. Section 4888 of the Revised Statutes, 35 U.S.C.A. § 33, requires in part that the invention shall be described "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, * * * to make, construct, compound, and use the same".

Since the question of definiteness will arise further with other claims, it would aid to discuss at this point some statements by the Supreme Court on the subject of definiteness.

In the case of General Electric Co. v. Wabash Appliance Co., 1938, 304 U.S. 364 at page 369, 58 S.Ct. 899, 901, 82 L.Ed. 1402, the Court stated: "Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirement as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' The claims 'measure the invention.' Patentees may reasonably anticipate that claimed inventions, improvements and discoveries, turning on points so refined as the granular structure of products, require precise descriptions of the new characteristic for which protection is sought. In a limited field the variant must be clearly defined."

And in the case of United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232, the Court said: "The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clear-cut to enable courts to determine whether novelty and invention are genuine. * * *." 317 U.S. at page 236, 63 S.Ct. at page 170.

Claim 4 refers to grooves, pits or other depressions in a chromium member, the distribution, number, size and depth of those grooves, pits or depression being *"at least as great* approximately as the distribution, number, size and depth which result from passing a current through an electroplated chromium surface * * *." (Emphasis added.) It is apparent on the face of this claim that a minimum size and shape is stated for the depressions, but no maximum is stated, and depressions of unlimited size would infringe upon this claim if they had shape and distribution of plaintiff's depressions. Furthermore the process of producing the depressions in this claim is not sufficiently stated in the patent in suit or in any patents referred to therein, as will be more fully discussed below.

Therefore claim 4 is held to be non-infringed and invalid.

### V. Claims 6, 9, 13, 22–27

These claims use terms such as "a multitude" (claims 6, 7, 13), "at least many" (claims 6, 22) "some of which" (claims 9, 13), "few if any" (claim 9), "at least some" (claims 23, 24) and other terms which defendant says are indefinite. I do not believe that these terms are indefinite as used considering that van der Horst was attempting to describe a plane area dotted with numerous grooves, pits and depressions. Since the greater the magnification the greater the number of microscopic depres-

sions that are visible, it is extremely difficult to describe these depressions with much more specificity than is given in the patent.

■ I do believe that one of the defects in these claims is that essentially plaintiff is attempting to describe a composite of depressions having a range of width, depth, porosity and shape. It seems to me to be bad practice for an applicant to patent the width of his depressions in one claim, the depth in another, the shape in another and so forth. A claim is supposed to represent a separate and distinct invention, not be a partial description of an invention.

It should be noted in passing that the examiner upon the application for the instant patent also reacted in this manner to the claims when he stated: "Further, the claims 1 to 30 in this case are all rejected on the ground of undue multiplicity, since they only differ by mere functional statements and different words and phrases for defining the same elements. In practice, each claim is supposed to define a separate and distinct invention, but in practice the Office allows a reasonable number of claims. However, thirty claims due to the simplicity of applicant's invention, differing only by mere words and phrases as to size, width and depth of depressions or pits, etc., is uniformly condemned by the courts. * * " (Exhibit T, pp. 24–25.)

Claim 13 is alleged to be indefinite since it characterizes the depressions as being more than 0.0002 inch deep, and that therefore no maximum depth is given for the depressions. I believe the specifications and process patent (which is referred to specifically in the patent in suit and hence used as a source of disclosure) (p. 1, col. 1, lines 34–40) sufficiently disclose that the maximum depth of the depressions is limited by the depth of the layer of plated chromium, with a small margin of chromium to remain in all cases as a protection against corrosion. Therefore claim 13 is definite enough in this respect—for in no event can the depressions be deeper that the layer of chromium.

■ Plaintiff's patent claims a product, namely, a chromium surface containing certain depressions. Every product patent is

required to state at least one method or process of obtaining the product. Plaintiff alleges that it has sufficiently disclosed a method, namely the reverse current method, for obtaining the product.

Claim 4 of the patent and other claims not in suit state that after electroplating the surface should be subjected to a reverse current range—between 150 and 450 ampere-minutes per square decimeter and then honed to finish. The specifications (col. 1, lines 35–46) describe the electroplating method as that revealed in van der Horst's patent No. 2,048,578. The experts testified that the plating conditions play a vital part in the ultimate surface obtained.

The 2,048,578 patent specifies the plating conditions to be a current density from 30 to 70 amperes per square decimeter, the pressure from 3 to 5 volts and the temperature of the plating bath from 55° to 65° C. (p. 2, col. 1, lines 68–74).

The question of definiteness of the process arises in the first instance as to the composition of the plating bath. The '578 patent states that: "The deposition of the chromium is carried out in a plating bath of normal constitution, a suitable bath consisting of 350 grammes of chromic acid per litre of water with the addition of a sulphate which may be provided by the addition to the solution of approximately 1% of sulphuric acid." (p. 1, col. 2, lines 38–44.)

Does the 1% of sulphuric acid mean 1% of the total solution of chromic acid and water or 1% of the chromic acid alone? As the Court reads it, it appears to mean 1% of the total solution which would be a ratio of about 30 to 1 of chromic acid to sulphuric acid. Plaintiff claims that this is not the correct interpretation because a "plating bath of normal constitution" is 100 to 1 chromic acid to sulphuric acid and that that is what the 1% in the '578 patent indicates. Plaintiff's experts said that they would so read the patent.

However it appears that Dr. van der Horst did not subscribe to the "normal" plating solution. In a question and answer session following the reading of his paper at the 1943 proceedings referred to in Exhibit TTT, Dr. van der Horst stated that he liked to use a sulphate content with a ratio of 45 to 1. Furthermore his prior patents contained ratios of 25 to 1 up to 40 to 1. In view of his own statements and practice and the phrasing of the patent language, I believe a 30 to 1 ratio is indicated as a "suitable bath". This also leads to an anomaly, for an expert now reading the patent would undoubtedly use the normal 1% bath which is *now* used by the plaintiff and thereby obtain correct results, whereas van der Horst may have intended the 30 to 1 ratio to be used. However because of the general language used by the patentee referring to "a plating bath of normal constitution", I will assume, for purposes of this decision, without deciding, that there was sufficient disclosure in the patent for a plating expert.

The next question relating to definiteness pertains to the amount of honing to be done. This operation, which appeared to be a mere polishing operation at the commencement of the trial, became extremely important as the trial reached its conclusion.

The specifications refer to the amount of honing as follows:

" * * * and then hone the so treated surface of the chromium to the size desired, and at least usually to a depth short of the bottoms of the grooves or pores resulting from the current, and usually using first a rough hone and then a finer one to finish." (col. 3, lines 43–48.)

"Within the term 'honing' and the like as here used, I include abrasive actions." (col. 3, lines 57–58.)

"The greater the honing in any instance the greater is the percentage of the total face area occupied by the plane metal areas * * * and, generally speaking, the shallower are the grooves, pits or depressions, and accordingly the smaller is the percentage of the total face area occupied by major depressions * * * and the less the porosity of the face of the chromium." (col. 6, lines 45–52.)

"Preferably the depressed areas * * * occupy between six per cent and seventy-five per cent of the total operating area of the face, dependent on the conditions

such as the load to be borne and the degree of porosity desired for oil retention." (col. 6, lines 61–66.)

It would appear at first blush that the required honing is sufficiently stated, for it is evident that whatever the porosity or depth of the depressions, continued honing would reduce the porosity and eventually there would be just bright, dense chromium left. However, the defect pointed up here is the *complete lack of correlation* between the plating, deplating and honing conditions and the dimensions specified in the claims. The expert attempting to obtain let us say 50% porosity on the surface area would have to experiment to a considerable extent. What plating bath shall he use? What plating current? What temperature bath? What reverse current? What changes in conditions are critical? What amount of honing?

Plaintiff offered in evidence many experimental photographs of its product. Among these are Exhibits 55 and 56 which are almost *identical* though one was produced using a reverse current of 150 ampere-minutes per square decimeter and the other 450 ampere-minutes per square decimeter, the plating conditions being the same. The similarity between the two was attributed to the *great degree of honing* done on the 450 ampere-minutes per square decimeter product.

Furthermore the 450 ampere-minutes per square decimeter product, Exhibit 55 is almost identical with another 450 ampere-minutes per square decimeter product which was produced with a considerably different plating current (Exhibit 51). This points up the fact that it is difficult to determine what "variables" must be varied and to what extent in order to vary the ultimate surface.

It was testified that the honing is what is used to vary the ultimate porosity so considerably, for the porosity before honing of Exhibit 47 produced at 150 ampere-minutes per square decimeter was about 50% and as appearing upon the photograph after honing the porosity is about 5%.

Thus the patent insufficiently discloses the conditions for obtaining specific forms of plaintiff's product within the ranges of the dimensions, and also insufficiently states the high degree of importance of honing for obtaining the end product.

Furthermore under some conditions a product results having "pin-point" depressions similar to Figure 3 of the patent in suit, and under other conditions "channels" are produced similar to Figure 1 of the patent. In the patent only the width of the depressions is given as critical, not their length, and it may be that there is no difference in function between the types of depressions but on the other hand plaintiff uses and prefers the "pin-point" type of depressions; this may have some significance. In any event the patent is silent in this regard.

Then too van der Horst has apparently claimed in the patent in suit more than he is entitled to. Plaintiff's experimental photographs illustrate the fact that virtually all depressions, grooves and pits are of the order of .004 inch or smaller in width. I do not see how plaintiff can justify its claim in claims 9, 24 and 25 in suit of up to .0125 of an inch for the width of its depressions. The Court's observations on this point are substantiated by Mr. Pyles' testimony as to plaintiff's experimental photographs, which are Exhibits 20, 21 and 22, that the depressions on those surfaces were four thousandths of an inch or less in width and that the change envisaged in going from 150 ampere-minutes per square decimeter to 300 ampere-minutes per square decimeter and thence to 450 ampere-minutes per square decimeter, i. e. from Exhibit 20 to 21 to 22, is that there are many more depressions rather than larger sized depressions. Record p. 256. Further, it is amazing that the Meyer affidavit, quoted from supra, speaks of the *maximum width* of the van der Horst crevices as being of the order of *.0005 inch.* (Exhibit S, p. 80.)

Hence plaintiff's claim of up to .0125 of an inch should be held invalid as being beyond the scope of plaintiff's depressions. Having done this, it appears that only the minor depressions in the infringing cylinders produced by the defendant are as narrow as .004 of an inch, thus raising serious

doubts as to the extent of defendant's infringement.

The Court therefore finds that the patent insufficiently discloses the process of obtaining the product, that the product is not correlated with the process so as to permit an expert using the patent to obtain a specific product, and that claims 9, 24 and 25 are broader than the inventor is entitled to claim.

Since the claims are also invalid on more substantial grounds than so far stated, the Court will continue further.

## VI. Invention and the Prior Art

■ It is well recognized that the quality of "invention" required to sustain a patent has increased so considerably that it has been said by a Justice of the Supreme Court that "the only patent that is valid is one which this Court has not been able to get its hands on." Jungersen v. Ostby & Barton Co., 1949, 335 U.S. 560, 572, 69 S.Ct. 269, 274, 93 L.Ed. 235. The invention required to justify a patent must "serve the ends of science—to push back the frontiers of chemistry, physics, and the like; to make a distinctive contribution to scientific knowledge. * * * It it not enough that an article is new and useful." Mr. Justice Douglas concurring in Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 1950, 340 U.S. 147, 154–155, 71 S.Ct. 127, 131. Furthermore the inventor may "benefit the art by a discovery of what it had practically never possessed or had possessed and lost. But there is no room for 'lost arts' in the case of inventions, 'described in printed publications in this or any foreign country'; the statute is plain and inexorable." Frank B. Killian & Co. v. Allied Latex Corp., 2 Cir., 1951, 188 F.2d 940, 944.

Plaintiff in this case claims essentially as the invention the application of a porous chromium surface to engine cylinders and the like. The porous surface is able to retain oil and prevent seizing or picking up, thereby making it a well-wearing surface.

The prior art patents offered by the defendant are as follows:

Loudenbeck patent No. 1,129,304 issued February 23, 1915 relating to lubricating surfaces of slide valves and the like by first smoothing the surface and then roughening the same in such manner that the generally smooth character of the surface is preserved. The patent suggests etching as the roughening method though it says other ways may be employed.

"Slide valves and the like" would come within the even narrowed scope of plaintiff's patent and it is evident that if the surface is generally smooth after roughening, that the depressions or grooves from roughening must of necessity fall within plaintiff's claims.

■ It is essential to keep in mind the distinction between plaintiff's process and its product. The product patent in suit claims grooves of certain dimensions, however they are produced (with the exception of claim 4). It is plaintiff's claim that these grooves or depressions are inventive in the field applied. True Loudenbeck's patent is for a process, but a process may sufficiently disclose a product to negative any invention in a subsequent patent.

The Koether patent No. 1,830,841 issued November 10, 1931 pertains to piston rings, also a subject in plaintiff's narrowed field. The invention consists in producing upon the wearing face of the ring a series of infinitesimal criss-cross grooves which have the effect, when the ring is positioned, of permitting the oil to be immediately conducted across the wearing face of the ring as well as around the ring. This too is lubrication of a wearing surface by grooves of the dimensions of necessity within plaintiff's range.

The Bengston patent No. 2,036,740 issued April 7, 1936 relates to pistons made of aluminum base alloy. The discovery claimed is that when aluminum pistons are treated by one of the several known methods to produce on the wearing surface thereof a hard, minutely porous and absorbent oxide coating of appreciable thickness, and the coated piston treated in such manner as to cause lubricating oil to be absorbed in the minute pores of the coating, the resultant product has highly useful wearing qualities. The patent also speaks of cylinders (p. 1, col. 1, line 47) and a sug-

gested method of producing the oxide coatings is to make the aluminum the anode in an electrolytic cell the electrolyte of which is a solution of one of various substances such as sulfuric acid, chromic acid, oxalic acid, etc. (p. 1, col. 2, lines 47–53). This is simply the reverse current method resulting in a porous surface! It is difficult to see how this differs from plaintiff's patent except that plaintiff uses chromium and prefers the resulting depressions in chromium to those in aluminum.

Defendant's Exhibit VV is a photograph at 100 magnification of a surface anodized according to the Bengston patent. A simple examination and measuring reveals that numerous depressions are within the range of the dimensions of plaintiff's patent.

Van der Horst's own process for depositing chromium on cylinder bores of internal combustion engines and the like, patent No. 2,048,578 dated July 21, 1936, shows the state of the prior art and the admitted knowledge of the field at the time of the application for the patent in suit.

The aforementioned Cleveland patent is dated April 12, 1938. The invention relates to improvements in press rolls for paper making machines. Cleveland found that a porous surface prevents the press roll from sticking to the paper. His porous product was obtained by roughening or indenting the metal roll surface, and thereafter chromium plating. The surface was to be roughened in any number of ways as for example by sand blasting or by etching with chemicals. The patent states that a random distribution of indentations results and that *any desired degree of porosity* may be obtained by variation in the etching or sand blasting process, or by the choice of a basis metal, or both (p. 1, col. 2, lines 48–53). Cleveland states that he can regulate the *type of pitting* by a suitable choice of abrasive material, size of abrasive particle, air pressure, distance between gun nozzle and object, time of action, and other factors (p. 2, col. 1, lines 10–14).

The product claimed is a sandblasted, chromium-plated and polished surface containing random indentations after plating ranging in diameter from about 0.005 to 0.04 inch and in depth from about 0.002 to 0.02 inch, the chromium plating having a thickness ranging from about 0.001 to 0.01 inch. More will be said about this patent subsequently in discussing defendant's actual use of this surface.

The Granger patent referred to earlier relates to a metal article having a chromium surface covered with a multiplicity of depressions and prominences of a size sufficient to be visible to the naked eye and producing a matte appearance, the tops of the prominences forming a substantially smooth, plane surface, in combination and in frictional contact with a second surface which is in relative motion with respect to said chromium surface. The inventors, Cleveland and Granger, produced their indentations, which vary between about 0.004 to 0.185 inch in diameter, and in depth about half their diameters, by blasting with an abrasive varying in size from 4 mesh to 150 mesh.

The Neely patent No. 2,266,377 dated December 16, 1941, and accepted only as indicating the state of the prior art, deals with "bearing" or "wearing" surfaces such as the surfaces of pistons and cylinders, piston rings, cylinder liners or engine blocks. The patent deals with forming a lubricant retaining surface in these surfaces, including cylinder walls of internal combustion engines, by pitting the surface as by selecting etching, or the like, so as to form upon such surface a multiplicity of fine recesses or pits which receive or retain lubricant. The patent alleges that piston rings and *liners* thus treated are found to wear in more rapidly than untreated parts (p. 3, col. 2, lines 70–72) and that the wearing in takes place without danger of scuffing, scarring or seizing (p. 4, col. 2, lines 24–29). If this was the knowledge of the field, wherein is plaintiff's invention?

We are not yet through with the prior art. According to a British patent, No. 521,572, dated May 24, 1940 the chrome plating on engine cylinder liners is applied by first shot blasting the surface of the liner and then plating the "de-smoothed" surface. The depressions on the liner surface are stated to be of the order of .002–.003 of an inch in depth.

428

Going back still further, a patent was issued in Germany in 1923 (No. 370,195) in which metal surfaces are made porous by anodizing the surface in an electrolytic bath in order to make a more adhesive surface. In another patent issued in Germany in 1924 (No. 520,898) a bearing surface is etched and thereby roughened to increase the adhesive properties of the lubricant.

Thus it can be seen, as plaintiff will concede, that it was known in the field for many years that roughening a metal surface would increase its wearing and lubricating properties. Roughening was done by blasting, etching, reversing the current and other means. Many of the patents cited above relate to engine liners and similar objects.

Plaintiff's patent does not even approach the high degree of invention required to sustain a patent. At the very best its product patent covers a mere new use of an old surface which is not patentable. Merit Mfg. Co. v. Hero Mfg. Co., 2 Cir., 1950, 185 F.2d 350; Mathews Conveyer Co. v. Palmer-Bee Co., 6 Cir., 1943, 135 F.2d 73, 89.

■ Plaintiff claims however that the dimensions of its depressions are patentable. This is clearly fallacious, for many of the prior art contain similar dimensions in their products. In any event a mere change in size, i. e. a "change only in form, proportions, or degree, doing the same thing in the same way, by substantially the same means, with better results, is not such an invention as will sustain a patent." Greene Process Metal Co. v. Washington Iron Works, 9 Cir., 1936, 84 F.2d 892, 894. See also Ranco v. Gwynn, 6 Cir., 1942, 128 F.2d 437.

Plaintiff maintains that the Cleveland patent does not contain depressions within its specifications. The Cleveland patent on its face specifies depressions down to .005 of an inch in width which is well within plaintiff's claimed range, though not within the range experimentally produced according to its process, as observed by this Court.

Furthermore, it appears obvious to the Court that if a metal is blasted with grit, that there will be numerous depressions in the metal smaller than .005 of an inch in width. Defendant's infringing surface, as pictured in plaintiff's Exhibits 37 and 38, was produced according to the Cleveland patent process, using No. 12 grit and is substantially identical with the surfaces produced by the defendant since 1934. Defendant's experts testified that when a surface is blasted with a grit of a given size it is unavoidable that numerous microscopic pits will be produced in the blasted surface.

Plaintiff had also contended that the Cleveland patent does not mention "plane" areas, i. e. the flat surface areas remaining after anodizing, as to claims 22 to 27 in suit. The Cleveland patent does require the base surface to be smooth before blasting and speaks of a *random distribution* of indentations in the final surface rather than a completely roughened surface. Since the chromium plates evenly reproduce the base surface it is evident that plane areas must be present on the final surface. Actual photographs of defendant's early surfaces show this to be the fact.

■ Thus aside from anticipation by the prior art, it appears that there is anticipation by defendant's own use of its identical surface prior to plaintiff's patent. It is well recognized in patent law, and appears self-evident, that that which later infringes, would, if earlier, anticipate. Galion Iron Works & Mfg. Co. v. Beckwith Machine Co., 3 Cir., 1939, 105 F.2d 941; Faries Mfg. Co. v. S. W. Farber Mfg. Co., 2 Cir., 1931, 47 F.2d 571. The fact that defendant may have applied the surface to few liners does not make it ineffective as prior use. Defendant's grained surfaces were produced on a great variety of wearing surfaces by using various sized grits to obtain a wide range of depression sizes. I would like to call particular attention to Exhibits O, P, R, KK, MM, NN, OO and QQ which are photographs of various surfaces produced by the defendant in 1938 and 1939. For example, Exhibit R, a photograph of a test plane blasted with No. 12 grit on or about March 21, 1939 has numerous depressions within the range of less than .0005 inch to about .01 inch in width, and is almost identical with the infringing surfaces of the defendant. Exhibit NN is very simi-

lar to Exhibit R and the infringing surfaces and Exhibit OO, blasted with No. 60 grit on or about March 21, 1939 has small depressions much more similar to plaintiff's surfaces than the infringing products of the defendant.

It is plaintiff's position however that van der Horst's invention was in adapting the porous chromium to engine cylinders and the like. Since the depressions used by van der Horst are of the same magnitude as depressions in metals used prior to the patent by the industry, and considering the admissions by Mr. Pyles as to pre-existing knowledge in the industry regarding plating chromium, reversing the current, honing and porous chromium, the only thing new that van der Horst can claim as to his general depression claims in suit (all except claim 4) is that through his "inventive genius" the idea of using such depressions on the surface of engine cylinders was born. Aside from the fact that this was a mere new use in a relatively young industry of chrome-plated objects, cf. Western States Mach. Co. v. S. S. Hepworth Co., supra, 147 F.2d at page 347; Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 1942, 124 F.2d 986, 987, it is evident that defendant had this same "inventive" idea in 1938 (Exhibits C, FF) and that various prior art patents such as the Granger, Bengston, Koether, Neely and British No. 521,572, referred to hydraulic rams, pistons and piston rings, engine cylinders, and cylinder liners prior to plaintiff's patent in suit. As Judge Learned Hand said in the Frank B. Killian & Co. v. Allied Latex case, supra, " * * * the inventor must justify his contribution against all that has gone before, known and unknown." [188 F. 2d 944.] It is not a big step and requires no invention to recognize that what lengthens the life of a wearing surface on one piece of equipment or machinery may afford the same result to a similar surface on a similar, or indeed, as has been shown above, an identical piece of equipment or machinery. Mast, Foos & Co. v. Stover Mfg. Co., 1900, 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856.

Hence there is nothing patentable in the claims in suit, excluding claim 4, over the prior art and prior surfaces.

## VII. Prior Public Use By Van Der Horst

Plaintiff had admitted that van der Horst produced liners in the United States in June 1939 and that they were in regular commercial use about the end of 1940 and that those liners had depressions of substantially the same dimensions and shape as those given in the patent in suit as the natural result of being produced by the van der Horst reverse current method.

Plaintiff therefore concedes that if it cannot take the date of the claims in suit back beyond the patent application date, February 22, 1943, that the admitted prior public use more than one year before the application date must invalidate those claims. 35 U.S.C.A. § 31.

Plaintiff seeks to carry the date back to van der Horst's British patent No. 518,694 or to its process patent No. 2,314, 604.

The first provisional specification of the British patent is September 2, 1938 which is mentioned in the patent in suit, but plaintiff concedes that nothing is said in this specification that would identify the specific depressions in the claims in suit.

The second provisional specification dated February 16, 1939 and the complete specification dated July 27, 1939, refer only to grooves, pits and depressions resulting from the reverse current method using 150 to 600 ampere-minutes per square decimeter. The process patent, No. 2,314,604 refers to the production of grooves, pits and depressions produced by a reverse current of 150–450 ampere-minutes per square decimeter.

Thus both of these patents refer only to depressions resulting from the reverse current treatment. Nothing is said about depressions resulting from other methods and no dimensions of any sort are given in these patents. Therefore aside from claim 4, none of the other claims in suit can be carried back as a continuation of an earlier patent and given a date earlier than February 22, 1943. The Court believes that only claim 4 can be carried back as a con-

tinuation until at least as early as April 25, 1939. Van der Horst attempted to amend his specifications in the process patent application in part to include other methods of producing depressions (Exhibit S, p. 16) which might have been a forerunner of the broad claims as to depressions in general, but the examiner, by letter dated September 9, 1941, required the cancellation of this proposed addition, stating: " * * * the inclusion of other methods of forming the grooves, pits, and depressions in the chromium surface departs from the original disclosure which was definitely limited to an electrolytic method. The added methods are entirely new, have no basis in the original disclosure, and accordingly constitute new matter." (Exhibit S, p. 40.)

 As has been stated before, where an applicant for a patent is compelled by the Patent Office to narrow his claim, he cannot thereafter argue for a broader construction of his patent. I. T. S. Rubber Co. v. Essex Rubber Co., supra. A second patent cannot be a "continuation" of an earlier patent if the earlier one was inadequate to support the product claims, as was the fact in this case. See Philip A. Hunt Co. v. Mallinckrodt Chemical Works, 2 Cir., 1949, 177 F.2d 583, 586; Good Roads Co. v. Charles Hvass & Co., 2 Cir., 1934, 70 F.2d 625, 627. The statute requires the patentee to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not. Permutit Co. v. Graver Corp., 1931, 284 U.S. 52, 60, 52 S.Ct. 53, 76 L.Ed. 163. There is nothing in the process patent that would indicate to one using a different method, such as sandblasting to form depressions on the walls of engine cylinders or other wearing surfaces that they may be infringing in any manner. Indeed, there is no clear indication in that patent as to the size or shape of any depressions resulting from the anodizing method. Following plaintiff's argument to its illogical extreme, a person desiring to sandblast a wearing surface, having just plaintiff's process patent before him would be required to obtain anodizing apparatus and go through the whole range of currents, temperature and other conditions stated in the plating and process patents in order to ascertain the size, shape and so forth of plaintiff's claimed depressions, and then could not be sure because honing would change the dimensions of the depressions and the specific amount of honing is left completely indefinite. Such mere possible inherency of the product in the process patent cannot support plaintiff's claim of a continuation. Application of Betz, 1948, 166 F.2d 831, 35 C.C.Pa., Patents, 1033.

Thus the Court finds that van der Horst admittedly publicly used the "inventions" claimed in claims 6, 9, 13 and 22 to 27 more than one year prior to their patent application date and they are therefore invalid on that ground. It should be noted that if plaintiff were permitted to carry the date of these claims back to the process patent, a serious question as to unlawful extension of monopoly would be presented. See Saranac Machine Co. v. Wirebounds Co., 1931, 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634. However, since that question becomes academic by this decision, it will not be considered further.

Defendant contends that if, as the Court has found, there was a prior use by van der Horst that invalidates some of the claims in suit, that van der Horst's failure to disclaim these claims without unreasonable delay invalidates the entire patent. 35 U.S.C.A. §§ 65, 71; Marconi Wireless Co. v. United States, 1943, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731. The Court believes, however, that plaintiff's contention as to the earlier date for its patent was reasonable and that this is the type case in which a duty to disclaim does not arise until the questions presented have been judicially determined. France Mfg. Co. v. Jefferson Electric Co., 6 Cir., 1939, 106 F.2d 605.

 It is therefore the Court's finding that claims 6, 9, 13 and 22 to 27 of patent No. 2,412,698 are infringed by defendant's product and that the claims are invalid for the reasons stated in this opinion. Claim 4 is found to be non-infringed and invalid.